[Cite as *State ex rel. Blaine v. State Emp. Relations Bd.*, 2025-Ohio-2233.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Richard Blaine, | : | |
| Relator, | : | |
| v. | : | No. 23AP-54 |
| State Employment Relations Board et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on June 26, 2025

**On brief:** *David Glenn Phillips*, for relator. **Argued:** *David Glenn Phillips*.

**On brief:** *Dave Yost*, Attorney General, and *Sherry M. Phillips*, for respondent State Employment Relations Board. **Argued:** *Sherry M. Phillips*.

**On brief:** *Daniel J. Leffler*, for respondent Youngstown Police Association. **Argued:** *Daniel J. Leffler*.

IN MANDAMUS
ON OBJECTIONS TO MAGISTRATE'S DECISION

BEATTY BLUNT, J.

{¶ 1} Relator, Richard Blaine, formerly a Youngstown Police Officer, filed a petition in the Seventh District Court of Appeals against respondents, the State Employment Relations Board ("SERB") and the Youngstown Police Association ("the Union"), requesting the court to issue a writ of mandamus ordering SERB to reverse its determination that there was no probable cause to believe that the Union had committed an unfair labor practice by failing to pursue arbitration of his grievance against the City of Youngstown Police Department ("the Department").

{¶ 2}   By agreement of the parties and order of the Seventh District, the case was transferred to this court. Pursuant to Civ.R. 53(C), Loc.R. 13(M), and this court's order, the case proceeded before a magistrate of the court. On September 27, 2024 our magistrate issued a decision recommending this court to issue a limited writ "ordering SERB to vacate its order dismissing Blaine's unfair labor practice charge, consider all facts and circumstances relevant to the alleged violation of R.C. 4117.11(B)(6), and issue a new order that sufficiently explains SERB's reasoning for its decision on that charge."   (Mag.'s Decision at ¶ 83.)  Blaine, the Union, and SERB have all filed objections to the magistrate's decision.  The Union argues that Blaine did not assert that it had any statutory duty to act in his complaint, and because it had no legal duty to pursue Blaine's work grievance that mandamus cannot lie as to the Union itself, and that SERB did not abuse its discretion in concluding that the Union did not commit an unfair labor practice.  SERB argues that it did not abuse its discretion in dismissing Blaine's unfair labor practice complaint against the Union because Blaine could not demonstrate that the Union's decision to forego further pursuing Blaine's grievance was arbitrary, discriminatory, or in bad faith, and that the evidence submitted to SERB could not establish a violation of R.C. 4117.11(B)(6). And Blaine argues that the magistrate's decision should be modified to order that SERB's decision be reversed in toto as an abuse of SERB's discretion and to further order that his allegations of an unfair labor practice against him by the Union must "be fully processed in a hearing before SERB."

{¶ 3}   Blaine was a Youngstown Police Officer from 1989 through 2002, and in June 2002 accepted a buyout from the Department and voluntarily retired. He applied for a service retirement from the Ohio Police and Fire Pension Fund in 2014 based on his prior 14 years of service.  But on May 16, 2018—nearly 16 years after he voluntarily retired— Blaine accepted a new position with the Department, based on a written offer from the Youngstown Chief of Police that was contingent on Blaine passing a drug test and medical examinations.

{¶ 4}   At the time he was presented the offer, Blaine requested the Department to consider his previous service with the Department in calculating his seniority, longevity, and hourly pay rate.  But on May 1, 2018 and prior to his acceptance of the offer of employment, the Department sent him another letter stating that Blaine was "not entitled

to retain any seniority from [his] previous service, pursuant to the current collective bargaining agreement," and that his salary would "begin at the Police Officer Step 1 rate and will progress through the 12 step wage schedule set forth in the collective bargaining agreement if you choose to accept the City's conditional offer of employment." (Stip. Evid. at 33 (cleaned up).) The magistrate described the relevant provisions of the 2018 collective bargaining agreement ("2018 CBA") as follows:

> Seniority for bargaining unit members was defined under Article 22 of the 2018 CBA. The term "bargaining unit seniority" was defined as "accumulated, continuous full-time service as a Patrol Officer with the City." (Stip. at 64.) Length of continuous service was broken under four specified circumstances, including a "voluntary termination (resignation)." (Stip. at 64.) The 2018 CBA used the term "bargaining unit seniority" in various contexts such as bidding for shift assignments and car preference.
>
> Salary and wages were addressed under Article 27 of the 2018 CBA. As referenced in Article 27, specific salary and hourly wage rates were contained in an appendix. The appendix consisted of a schedule with an 11-step classification system for police officers based on "Years of Full-Time Service." (Stip. at 93.) The years of full-time service at step 1 was listed as "Entry." (Stip. at 93.) Step 2 was reached after two years of full-time service. Subsequent steps were reached every year up to step 11, which was reached after 12 years of full-time service. The 2018 CBA also provided for a one-time lump sum payment to bargaining unit employees in varying amounts based on "Years of Full-Time Service." (Stip. at 70.)

(Mag.'s Decision at ¶ 27-28.)

{¶ 5} In response to the Department's letter Blaine complained to the Union, which determined that it could not pursue a grievance until Blaine completed his required one-year probationary period with the Department. Accordingly, in June 2019 the Union filed a grievance based on the City's failure to pay Blaine at step 12 of the pay scale contained in the 2018 CBA, and asserted that Blaine "previously accrued 14 years of service and should be at Step 12 of the pay scale in Appendix A. This is a continuing violation." (Stip. Evid. at 35, 118.) This grievance proceeded until it was ultimately denied by the City of Youngstown in a "mayor's designee" decision in September 2019. That decision rested on Blaine's acceptance of the terms in the appointment letter (which specified Blaine's rate of pay at

the step 1 level), and the mayor's designee found that Blaine was "not entitled to benefit from the cash incentive retirement he took in 2002 and now step back into City employment at the highest possible pay step based on his previous employment." (Stip. Evid. at 123.) And although not mentioned in his disposition of the grievance, the mayor's designee noted the argument that under the grievance procedure in the 2018 CBA, Blaine should have filed his grievance within 18 days of receiving his first paycheck in 2018.

{¶ 6} The 2018 CBA permitted the grievant to appeal the decision to arbitration within 30 days of the decision of the mayor's designee but conditioned this appeal on the signed approval of the president of the Union or the attorney for the Ohio Patrolmen's Benevolent Association ("OPBA"). Initially, the Union indicated to the Department that it would be taking Blaine's grievance into arbitration, in a signed letter from the OPBA's attorney. But the onset of the pandemic delayed this action substantially, and on May 26, 2021, the OPBA's attorney altered his opinion and notified the Union's executive board that he would not sign off on appealing the grievance decision. The letter from OPBA's attorney was apparently very detailed and contained a thorough explanation of his analysis; according to the magistrate's decision, it stated as follows:

> [N]otice of arbitration of Blaine's grievance was sent to the City "in order to preserve the timeliness of the request for arbitration." (Stip. at 36, 128.) Leffler stated that "[d]uring the next few months, there was discussion about the merits of the case," during which [OPBA Attorney] Leffler "indicated the grievance lacked merits." (Stip. at 36, 128.) Leffler summarized arguments made by the City during the grievance process and provided his opinion on the merits of these arguments as follows:
>
>> During the step 3 meeting, we were presented with several documents from the City. One was the separation agreement from 2002 * * * [in which] Blaine agreed to waive any recall rights. The City would argue that as a result of this agreement, Mr. Blaine agreed or waived any rights upon return to work. Legally, I don't put any preclusive value in the Agreement other than the City will use it as evidence that there was a permanent break in service thereby negating his claim to a higher wage rate.
>>
>> Second, in July 2014, Mr. Blaine applied for a service retirement with the Ohio Police and Fire Pension Fund.

> Again, I'm not convinced this has any relevance other than to show a permanent break in service. (Stip at 36, 128.)

Next, Leffler summarized Blaine's interactions with the City during the hiring process, noting that Blaine discussed his potential salary with the YPD officer responsible for providing him with the offer of employment. Leffler noted that the appointment letter from the City specifically stated that Blaine would start at the rate of pay designated for newly hired officers. Based on these facts, Leffler stated that "[i]n my opinion, Mr. Blaine accepting employment was an acquiescence to the terms of his employment that he would start at the hourly rate of $14.93." (Stip. at 36, 128.) Leffler provided the following reasoning in support of this conclusion:

> Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. *McSweeney v. Jackson*, 691 N.E.2d 303, 308 (Ohio Ct. App. 1996), citing, Restatement of the Law 2d, Contracts § 18 (1981). The Sixth Circuit has found that under Ohio law, mutual assent can be manifested by continued employment after the employee has been told explicitly that the change in the employment relationship was a condition of employment. See *Dantz v. American Apple Group, LLC*, [123 FED. APPX. 702], 2005 WL 465253, *4 (6th Cir. March 1, 2005).

> While the above case law is not directly on point because that was an at-will employment situation and here there is a CBA, I believe an arbitrator, looking at all the facts would conclude the same result. Additionally, here Mr. Blaine would essentially be at-will during his probationary period. While neither he nor the City can agree to modify the terms of the CBA, in this case, the CBA was not modified, it was just where he fit into the wage scale. He agreed to start at $14.93.

(Stip. at 36-37, 128-29.)

Leffler additionally pointed to the timeliness of the grievance in making his opinion, stating:

> Finally, he waited for 1 year to file the grievance. Mr. Blaine indicated that he was advised by someone within the [Association] to not file a grievance during his probationary period. Whether that was the case does

not change the evidence before the arbitrator that he was untimely in filing the grievance, to a supervisor within 7 days of knowledge of the alleged violation or within 18 days with the Chief of Police. The fact that Mr. Blaine specifically asked about the wage rate upon hire and was aware the Chief denied the request, then didn't complain, grieve or take any action for over a year is, in my opinion, fatal to the claim. The claim is almost certain to fail on timeliness and on the merits. Unfortunately, Covid-19 put a halt to any business during 2020 and I had a medical issue for early 2021. At this time, the OPBA will not sign off on arbitrating the grievance; therefore, the [Association] has final authority on arbitration.

(Stip. at 37, 129.) Finally, Leffler cited case law for the proposition that "[a] contract is ambiguous if it is susceptible to more than one reasonable interpretation," in support of the following arguments:

In this case, the arbitrator would determine whether years of service includes previously earned years before a permanent separation. If the arbitrator determines that the language does not include prior years of service, this would preclude any member wishing to return to Youngstown from receiving credit toward the higher wage rate. This would have a potential negative effect moving forward.

(Stip. at 37, 129.)

(Mag.'s Decision at ¶ 34-36.) Accordingly, the OPBA attorney apparently concluded that OPBA considered Blaine's grievance both lacking in merit and ultimately negative for the union's membership. The Union's executive board sent Blaine a letter indicating that after reviewing the OPBA attorney's position, the Union board had unanimously agreed with the OPBA attorney and would not pursue the appeal either. Blaine then appealed that executive board decision to the Union's full membership, but the membership also voted to deny further appeal of Blaine's grievance.

{¶ 7} Blaine then filed an unfair labor practice charge with SERB, alleging the Union had violated R.C. 4117.11(B)(6) by failing to fairly represent him as a bargaining unit employee. In support of this charge, Blaine submitted an email he alleged demonstrated that his grievance had been abandoned as part of a deal with the Department.

> Among the materials submitted by Blaine was a written communication dated January 21, 2021, which was allegedly composed by [OPBA Attorney] Leffler. In the communication, Leffler allegedly stated that based on communications with the City's labor counsel, the City was willing to place the three other officers at a higher step in pay scale under 2018 CBA, but was opposed to doing so for Blaine. Leffler allegedly stated that "we are picking the arbitrator for Blaine and [the City's labor counsel] is checking about settling the matter for the other 3," noting that "[t]he City may want to wait to settle the 3 until we get a decision back on Blaine, but if we can come up with an MOU about how these will be handled moving forward, they may be OK settling those now." (Stip. at 126.)

(Mag.'s Decision at ¶ 42.) SERB investigated Blaine's charge, but in an order issued December 9, 2021 dismissed the charge with prejudice. SERB's order noted that previous SERB decisions had held that "arbitrariness, discrimination and bad faith are distinct components of the same duty and should be reviewed on an equal basis . . . . [and] 'arbitrary' conduct . . . include[s] a failure to take a basic and required step without justification or viable excuse." (SERB Investigator's Memo at 3.) The investigation also found that the Union's letter denying the arbitration had informed Blaine that the executive board "agreed with OPBA. On May 27, 2021, we voted 5-0 to not move forward with this arbitration as we also believe it lacks merit, was untimely, and you clearly agreed to the starting wage as a conditional offer of employment," and that the Union body subsequently "voted 8-5 not to advance the grievance to arbitration. . . ." The Union accordingly contended that it "took 'all necessary steps' throughout the grievance procedure, up to the point of arbitration . . . . [But that] based on the advice of its Counsel, [it] declined to arbitrate Mr. Blaine's grievance because it was both without merit and untimely filed." *Id.* at 2, ¶ 8-10.

{¶ 8} On review, SERB concluded that Blaine had not demonstrated that he was not fairly represented by the Union, and that therefore the Union's decision did not constitute an unfair labor practice. Blaine filed a motion for reconsideration with SERB, accompanied by an affidavit in which he stated that the reason he did not file his grievance immediately upon hiring was because he was told he could not do so by the Union's president. Blaine also submitted the 2021 CBA between the Union and the City, which for the first time included language specifically stating that a break in service longer than two years meant that service prior to that break could not be counted for purposes of salary or

seniority. Blaine argued that this evidence supported his contention that the Union had traded his grievance away for other benefits. SERB denied the motion for reconsideration.

{¶ 9} Blaine then pursued this mandamus petition. On September 27, 2024, our magistrate issued a decision recommending this court issue a limited writ:

> SERB appears to have agreed with the Association's determination that the grievance was untimely, thereby supporting its decision to withdraw the grievance from arbitration. However, the undisputed evidence in the record reflects that when Blaine was rehired in 2018, he notified the Association that he wished to bring a grievance regarding his pay based on the City's interpretation of the 2018 CBA. The Association did not bring a grievance until June 2019. The Association then relied on the alleged untimeliness of Blaine's grievance as a reason for ultimately deciding not to pursue arbitration. SERB did not address the Association's responsibility for timely filing the grievance or whether the Association was responsible for causing the grievance to be untimely in its decision dismissing the unfair labor practice charge or in its decision denying Blaine's request for reconsideration. . . . Without more explanation, it is unclear how SERB resolved the factual questions in the record to find that the Association's stated reason that the grievance was untimely was a legitimate, rational basis to withdraw the request for arbitration. On this basis alone, a limited writ ordering SERB to provide reasons in support of its decision is appropriate.

(Mag.'s Decision at ¶ 71-72.) On the merits of Blaine's claim, the magistrate observed:

> A union need not process a grievance, let alone advance a grievance to arbitration, that it finds to be lacking in merit, provided that determination of the merits is made in good faith. And a change of position, in and of itself, may not necessarily reflect a breach of the duty of good faith representation. Yet, here, SERB's decision does not mention the Association's change in position on the merits of the grievance or the Association's pursuit of a settlement on behalf of three other bargaining unit members with a similar issue. This court cannot substitute its judgment for that of SERB when resolving conflicts in the evidence, but there is no indication that SERB exercised its judgment or even recognized any of the inconsistencies pointed out by Blaine when it cited the Association's reason that the grievance lacked merit. In the absence of any explanation or reasoning from SERB regarding any of these issues in either the decision dismissing the unfair

labor practice charge or the decision denying Blaine's request for reconsideration, it is difficult, if not impossible, to discern whether SERB abused its discretion. Therefore, in light of and consistent with the recommendation to grant a limited writ ordering SERB to explain its reasoning related to the timeliness of the grievance, the magistrate recommends that this court also order SERB to provide an explanation of its reasoning with regard to the merits of Blaine's grievance.

(Internal citations and quotations omitted.) *Id*. at 82. The case is now before the court on objections filed by all parties.

{¶ 10} SERB argues that dismissal of the charge was within its discretion, because Blain did not meet his burden to show that the Union failed to fairly represent him when it refused to proceed to arbitration of his grievance, because under its precedent "SERB will look at whether a union acted arbitrarily, discriminatorily, or in bad faith only if the union cannot advance a legitimate, rational basis for its actions." (SERB Obj. at 13.) SERB's objection observes that "[e]ven though the Union had supported Blaine's position throughout the grievance process, it provided a rational basis for its decision not to proceed to arbitration."

Blaine has asserted that the Union's expressed basis for forgoing arbitration was pretextual, and that the decision was made, not because the grievance lacked merit, but because the Union wanted to further its contractual negotiations with the City of Youngstown. However, even assuming that this allegation is true, it does not support Blaine's position. . . . The Union was also able to reach a settlement with the City to permit three other bargaining unit members to return to their previous rates of pay, where their absences had each been less than one year. Although Blaine complains that these disparate results are evidence of an improper motive by the Union, in fact they demonstrate that the Union sought the best overall outcome for its bargaining unit members then and in the future. The two-year rule represents a reasonable compromise between the City and the Union, particularly because Blaine's sixteen-year absence is an extreme situation that is unlikely to be repeated. Given the vast difference in years spent away from the force, the fact that Blaine was treated differently than bargaining unit members who were away fewer than two years does not mean that he was subjected to improper disparate treatment.

(Internal citations and quotations omitted.) *Id*. at 16-17.

{¶ 11} The Union agrees with SERB on these issues, and further observes that Blaine's petition does not identify any specific breach of legal duty by the Union and asserts no cause of action or demand against the Union. The Union therefore contends mandamus cannot lie as to it.

{¶ 12} In his objection, Blaine argues that he brought forth sufficient facts to establish that the delay in filing the grievance was the fault of the Union, and on the merits he argues that he brought forth sufficient facts and evidence establishing that he was treated differently than other Union members on the same issue, and that therefore there was evidence of pretext by the Union.

{¶ 13} A writ of mandamus is an extraordinary remedy that " 'command[s] the performance of an act which the law specifically enjoins as a duty.' " S*tate ex rel. Russell v. Klatt*, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. For a writ of mandamus to issue in this matter, Blaine must establish, by clear and convincing evidence, that he has a clear legal right to the requested relief, that SERB has a clear legal duty to grant such relief, and he has no other adequate remedy in the ordinary course of the law. *See, e.g., State ex rel. Gil-Llamas v. Hardin*, 2021-Ohio-1508, ¶ 19. "[C]lear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *See, e.g., State ex rel. Ware v. Crawford*, 2022-Ohio-295, ¶ 14. Because SERB's probable cause determinations in an unfair labor practice case are not reviewable by direct appeal, mandamus is the appropriate remedy to obtain judicial review of SERB's order dismissing Blaine's charge. *See, e.g., State ex rel. Ames v. SERB*, 2019-Ohio-1003, ¶ 33 (10th Dist.) (citing cases).

{¶ 14} R.C. 4117.11(B)(6) provides that "[i]t is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to . . . [f]ail to fairly represent all public employees in a bargaining unit . . . ."

> The dismissal of a ULP charge by SERB will be overturned in a mandamus action to this court only if relator can prove SERB abused its discretion. The relator is not required to irrefutably establish the merits of her grievance . . . . The pertinent issue is whether probable cause exists to believe that an unfair labor practice has occurred, not whether an unfair labor practice actually occurred. However, in reviewing SERB's dismissal of the ULP charge, because mandamus proceedings are premised upon the relators' establishing an abuse of discretion by SERB in its probable-cause determination, courts should not substitute their judgment for that of the administrative agency.

> Public employees have no absolute right under R.C. 4117.11(B)(6) to see a grievance taken to arbitration. As a result, unions have discretion in deciding which grievances warrant the allocation of resources to take them to arbitration.

(Internal citations and quotations omitted.) *Ames*, 2019-Ohio-1003 at ¶ 34-35

{¶ 15} In his decision, our magistrate concluded that SERB's decision was too lacking in reasoning, and that "there is no indication that SERB exercised its judgment or even recognized any of the inconsistencies pointed out by Blaine when it cited the [union]'s reason that the grievance lacked merit . . . [and that therefore] it is difficult, if not impossible, to discern whether SERB abused its discretion." (Mag. Dec. at ¶ 23-24.) We disagree. The record before us clearly establishes that SERB determined that it was the Union's position that Blaine's grievance lacked merit was reasonable and did not constitute an unfair labor practice under R.C. 4117.11(B)(6). SERB specifically found:

> Mr. Blaine has failed to provide sufficient information or documentation to show how the [Association's] actions were arbitrary, discriminatory or in bad faith when it voted not to advance his grievance to arbitration. The [Association's] President advised Mr. Blaine that, based on the advice of Counsel and a vote by the Executive Board, it would not be advancing his grievance to arbitration because it was untimely filed and lacked merit. The [Association] provided Mr. Blaine an opportunity to appeal the decision not to arbitrate, which he accepted, but the membership voted not to advance the grievance to arbitration, and the grievance was subsequently withdrawn. Based on the totality of the circumstances, the [Association's] actions do not rise to the level of a (B)(6) violation of the statute. (Stip. at 143.)

(Mag.'s Decision at ¶ 44 (quoting Dismissal of Unfair Labor Practice Charge at 1.).) Based on all of the evidence set forth above, we cannot say that Blaine has met his burden to establish that SERB abused its discretion in finding that Blaine's unfair labor practice charge lacked probable cause. As we observed in *Ames*, "[p]ublic employees have no absolute right under R.C. 4117.11(B)(6) to see a grievance taken to arbitration. [And] unions have discretion in deciding which grievances warrant the allocation of resources to take them to arbitration." *Ames* at ¶ 35.

{¶ 16} In reaching its decision, SERB relied on evidence showing that the Union reasonably concluded that it had no obligation to pursue Blaine's unmeritorious grievance

even if it did so for three other Union members. The "breaks in service" of each of those members were for less than one year; by contrast, Blaine's break in service was over 14 years. Moreover, Blaine knew at the time he accepted the Department's offer of employment that it refused to give him that service credit. And despite Blaine's arguments, the mere fact that the Department and the Union resolved the ambiguity in the 2018 CBA when negotiating the 2021 CBA does not support his position that the Union acted unfairly. Resolution of contractual ambiguities is appropriate behavior by rational contracting parties, and the fact that the ultimate resolution of this particular ambiguity operated to embody the Union's position on the merits of Blaines grievance does not ipso facto show that the Union "traded away" Blaine's grievance in the contract negotiations—it just as easily demonstrates that both the Union and the Department wanted to incorporate an interpretation they had already agreed upon into the new contract.

{¶ 17} In any event, we observe that under the terms of the 2018 CBA, that alleged ambiguity may not really assist Blaine's grievance. Under the 2018 CBA, retirement may well constitute a form of "voluntary termination (resignation)," meaning that the Department could have argued that *any* break in service precluded the use of prior years of seniority for new hires. Accordingly, the Department had a very good argument that its decision to deny seniority to Blaine was not arbitrary—meaning that the Union therefore acted within its discretion to refuse to appeal Blaine's grievance, and therefore ultimately that SERB did not abuse its discretion in concluding that Blaine had failed to establish probable cause showing that the Union had committed an unfair labor practice.

{¶ 18} For all these reasons, we sustain SERB's objection to the magistrate's decision, sustain the Union's objection to the magistrate's decision, and overrule Blaine's objection to the magistrate's decision. We therefore reject the magistrate's decision and dismiss the petition for mandamus.

*Petition dismissed.*

JAMISON, P.J., and DORRIAN, J., concur.

———————————

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Richard Blaine, | : | |
| Relator, | : | |
| v. | : | No. 23AP-54 |
| State Employment Relations Board et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on September 27, 2024

*David Glenn Phillips*, for relator.

*Dave Yost*, Attorney General, and *Sherry M. Phillips*, for respondent State Employment Relations Board.

*Daniel J. Leffler*, for respondent Youngstown Police Association.

IN MANDAMUS

**{¶ 19}** Relator Richard Blaine seeks a writ of mandamus ordering respondent State Employment Relations Board ("SERB") to reverse its determination that no probable cause existed to believe respondent Youngstown Police Association ("the Association") committed an unfair labor practice under R.C. 4117.11(B)(6).

**I. Findings of Fact**

{¶ 20} 1. Blaine, a member of the Association, is employed by the City of Youngstown ("the City") as a police officer in the Youngstown Police Department ("YPD"). Blaine is a public employee under R.C. 4117.01(C).

{¶ 21} 2. The City is a public employer under R.C. 4117.01(B).

{¶ 22} 3. The Association is an employee organization under R.C. 4117.01(D).

{¶ 23} 4. The City and Association were parties to a collective bargaining agreement ("CBA"), which was effective from August 12, 2018 through November 30, 2021 (hereinafter referred to as the "2018 CBA"). All YPD sworn police officers with the rank of patrol officer, including Blaine, were members of the bargaining unit. The Association was recognized as the sole and exclusive bargaining agent for all members of the bargaining unit for any and all matters related to wages, hours, and working conditions. The agreement provided that the City was permitted to utilize "part-time/auxiliary officers," which it distinguished from "full-time officers." (Stip. at 62.)

{¶ 24} The 2018 CBA provided a process for addressing grievances, which was defined as "any dispute between an employee and the City or its representative involving an allegation that there has been a breach, misinterpretation, or improper application of this Agreement." (Stip. at 54.) The grievance procedure consisted of four steps. Either the employee or the Association representative was permitted to start the grievance process beginning at either step one or step two.

{¶ 25} Under step one of the grievance procedure, the employee was to discuss the grievance with the employee's immediate supervisor within seven calendar days of the occurrence initiating the grievance. Under step two, the employee or the Association were to submit the grievance in writing to the YPD chief of police within 18 calendar days of the

answer under step one, or, if starting at step two, within 18 calendar days of the occurrence initiating the grievance. If unsatisfied with the decision of the chief of police or the chief's representative under step two, the employee or Association was required to process the grievance to step three within 14 calendar days of the step two decision. Under step three, the mayor's designee was required to either grant the remedy or hold a hearing to evaluate and decide the grievance.

{¶ 26} Under step four of the grievance procedure, the 2018 CBA permitted the grievant to appeal the decision to arbitration within 30 days of the decision of the mayor's designee under step three. Notably, this appeal to arbitration was conditioned on the signed approval of the president of the Association or the attorney for the Ohio Patrolmen's Benevolent Association ("OPBA"). Regarding timing of the arbitration process, the 2018 CBA provided that the parties were required to attempt to confer for the purpose of selecting an arbitrator within seven days of the appeal for arbitration. If the parties failed to confer or agree within seven days, the City or the YPA were permitted ten days to request a panel of nine federal arbitrators. All grievances were required to be submitted to the federal arbitration service within 17 calendar days of the grievance being submitted for arbitration or the grievance would be considered untimely.

{¶ 27} Seniority for bargaining unit members was defined under Article 22 of the 2018 CBA. The term "bargaining unit seniority" was defined as "accumulated, continuous full-time service as a Patrol Officer with the City." (Stip. at 64.) Length of continuous service was broken under four specified circumstances, including a "voluntary termination (resignation)." (Stip. at 64.) The 2018 CBA used the term "bargaining unit seniority" in various contexts such as bidding for shift assignments and car preference.

{¶ 28} Salary and wages were addressed under Article 27 of the 2018 CBA. As referenced in Article 27, specific salary and hourly wage rates were contained in an appendix. The appendix consisted of a schedule with an 11-step classification system for police officers based on "Years of Full-Time Service." (Stip. at 93.) The years of full-time service at step 1 was listed as "Entry." (Stip. at 93.) Step 2 was reached after two years of full-time service. Subsequent steps were reached every year up to step 11, which was reached after 12 years of full-time service. The 2018 CBA also provided for a one-time lump sum payment to bargaining unit employees in varying amounts based on "Years of Full-Time Service." (Stip. at 70.)

{¶ 29} 5. Blaine was employed by the City as a police officer from 1989 until 2002, when he voluntarily retired. On April 30, 2018, the YPD chief of police sent Blaine a written offer of employment that was contingent on Blaine passing a drug test and medical examinations. On May 1, 2018, YPD sent Blaine another letter addressing Blaine's rate of pay as follows:

> On April 30, 2018 you were given a conditional offer of employment for the position of Police Officer. You requested that the City consider your previous 13 years of service with [YPD] * * * in calculating your seniority, longevity and hourly pay rate.
>
> After consulting with the Civil Service Department and the Law Department, it was determined that you are not entitled to retain any seniority from your previous service, pursuant to the current * * * collective bargaining agreement. Consequently, your salary will begin at the *Police Officer –* Step 1 rate * * * and will progress through the 12 step wage schedule set forth in the * * * collective bargaining agreement if you choose to accept the City's conditional offer of employment.

(Emphasis in original.) (Stip. at 33.) In a letter dated May 11, 2018, the City appointed Blaine to the position of police officer with YPD at the step 1 pay rate, noting that Blaine's

appointment was not final until the satisfactory completion of his one-year probationary period.

{¶ 30} 6. In June 2019, the Association pursued a grievance on behalf of Blaine based on the failure of the City to pay Blaine at step 12 of the pay scale contained in the 2018 CBA. An OPBA official grievance form, which was signed by Daniel Leffler, legal counsel for OPBA, contained the following statement of Blaine's grievance: "[Blaine] was not placed at the proper step of the pay scale based on years of service with [the City]. [Blaine] previously accrued 14 years of service and should be at Step 12 of the pay scale in Appendix A. This is a continuing violation." (Stip. at 35, 118.)

{¶ 31} 7. Blaine's grievance progressed through the steps of the grievance process until it was ultimately denied by the City in a mayor designee decision ("grievance decision") in September 2019. In the grievance decision, the mayor's designee noted Blaine's appointment letter that specified Blaine's rate of pay at the step 1 level. The designee found that Blaine was "not entitled to benefit from the cash incentive retirement he took in 2002 and now step back into City employment at the highest possible pay step based on his previous employment." (Stip. at 122.) Although not mentioned in the disposition of the grievance, arguments were noted regarding the timeliness of Blaine's grievance. Specifically, the mayor's designee noted the argument that under the grievance procedure in the 2018 CBA, Blaine should have filed his grievance within 18 days of receiving his first paycheck in 2018.

{¶ 32} 8. By email on October 7, 2019, Leffler informed the City and YPD that the Association would advance Blaine's grievance to arbitration. However, the grievance was never arbitrated.

{¶ 33} 9. In a letter dated June 1, 2021, the Association's president informed Blaine that the Association's executive board had decided to not move forward with taking Blaine's grievance to arbitration. The Association's president stated that on May 26, 2021, the executive board was notified by Leffler that OPBA would not "sign off on arbitrating this case." (Stip. at 36, 128.) The letter from the Association's president appeared to include an embedded copy of a legal opinion provided by Leffler in support of OPBA's decision to not support arbitration.

{¶ 34} As copied in the letter from the Association's president, Leffler stated that after the decision of the mayor's designee was rendered, notice of arbitration of Blaine's grievance was sent to the City "in order to preserve the timeliness of the request for arbitration." (Stip. at 36, 128.) Leffler stated that "[d]uring the next few months, there was discussion about the merits of the case," during which Leffler "indicated the grievance lacked merits." (Stip. at 36, 128.) Leffler summarized arguments made by the City during the grievance process and provided his opinion on the merits of these arguments as follows:

> During the step 3 meeting, we were presented with several documents from the City. One was the separation agreement from 2002 * * * [in which] Blaine agreed to waive any recall rights. The City would argue that as a result of this agreement, Mr. Blaine agreed or waived any rights upon return to work. Legally, I don't put any preclusive value in the Agreement other than the City will use it as evidence that there was a permanent break in service thereby negating his claim to a higher wage rate.
>
> Second, in July 2014, Mr. Blaine applied for a service retirement with the Ohio Police and Fire Pension Fund. Again, I'm not convinced this has any relevance other than to show a permanent break in service.

(Stip. at 36, 128.)

{¶ 35} Next, Leffler summarized Blaine's interactions with the City during the hiring process, noting that Blaine discussed his potential salary with the YPD officer responsible

for providing him with the offer of employment. Leffler noted that the appointment letter from the City specifically stated that Blaine would start at the rate of pay designated for newly hired officers. Based on these facts, Leffler stated that "[i]n my opinion, Mr. Blaine accepting employment was an acquiescence to the terms of his employment that he would start at the hourly rate of $14.93." (Stip. at 36, 128.) Leffler provided the following reasoning in support of this conclusion:

> Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance. *McSweeney v. Jackson*, 691 N.E.2d 303, 308 (Ohio Ct. App. 1996), citing, Restatement of the Law 2d, Contracts § 18 (1981). The Sixth Circuit has found that under Ohio law, mutual assent can be manifested by continued employment after the employee has been told explicitly that the change in the employment relationship was a condition of employment. *See Dantz v. American Apple Group, LLC*, [123 FED. APPX. 702], 2005 WL 465253, *4 (6th Cir. March 1, 2005).

> While the above case law is not directly on point because that was an at-will employment situation and here there is a CBA, I believe an arbitrator, looking at all the facts would conclude the same result. Additionally, here Mr. Blaine would essentially be at-will during his probationary period. While neither he nor the City can agree to modify the terms of the CBA, in this case, the CBA was not modified, it was just where he fit into the wage scale. He agreed to start at $14.93.

(Stip. at 36-37, 128-29.)

{¶ 36} Leffler additionally pointed to the timeliness of the grievance in making his opinion, stating:

> Finally, he waited for 1 year to file the grievance. Mr. Blaine indicated that he was advised by someone within the [Association] to not file a grievance during his probationary period. Whether that was the case does not change the evidence before the arbitrator that he was untimely in filing the grievance, to a supervisor within 7 days of knowledge of the alleged violation or within 18 days with the Chief of Police. The fact that Mr. Blaine specifically asked about the wage rate upon hire and was aware the Chief denied the request, then didn't complain, grieve or take any action for over a year is, in

my opinion, fatal to the claim. The claim is almost certain to fail on timeliness and on the merits. Unfortunately, Covid-19 put a halt to any business during 2020 and I had a medical issue for early 2021. At this time, the OPBA will not sign off on arbitrating the grievance; therefore, the [Association] has final authority on arbitration.

(Stip. at 37, 129.) Finally, Leffler cited case law for the proposition that "[a] contract is ambiguous if it is susceptible to more than one reasonable interpretation," in support of the following arguments:

In this case, the arbitrator would determine whether years of service includes previously earned years before a permanent separation. If the arbitrator determines that the language does not include prior years of service, this would preclude any member wishing to return to Youngstown from receiving credit toward the higher wage rate. This would have a potential negative effect moving forward.

(Stip. at 37, 129.) Based on this assessment, Leffler invited the Association to evaluate the merits of Blaine's grievance and determine how to proceed.

{¶ 37} Following the reproduction of the above opinion from Leffler, the Association's president explained in the letter to Blaine that the Association's executive board had reviewed Leffler's opinion and agreed, voting unanimously to not proceed with arbitration of Blaine's grievance. Informing Blaine of the basis for its decision, the Association's executive board stated that "we also believe [the grievance] lacks merit, was untimely, and you clearly agreed to the starting wage as a conditional offer of employment."

(Stip. at 37, 129.) Additionally, the Association stated:

Several factors went into [] our decision including if we did move forward and you did not prevail, the arbitrator could also impose that the city erred in giving you vacation and longevity. As such, you could be liable to pay that back. With that being said, it is in your interest we must weigh these factors in not agreeing to move forward to arbitration.

(Stip. at 37, 129.) The Association's executive board informed Blaine of his right to appeal to the union body to override the decision, noting that Blaine was required to file such an appeal in writing before June 17, 2021 and state the facts of the appeal. The Association's executive board also noted that a simple majority vote of the members in attendance at

the next regularly scheduled meeting was necessary to approve the grievance for arbitration.

{¶ 38} 10. In a letter to Blaine dated June 18, 2021, the Association informed Blaine that he had "exercised [his] appeal of the above numbered grievance to the union body." (Stip. at 130.) Based on the results of the vote, the Association stated that "[t]he union body denied [Blaine's] grievance to be arbitrated." As a result, the Association stated that it "considers this grievance closed and has forwarded such to the OPBA and the City." (Stip. at 130.)

{¶ 39} 11. Blaine filed an unfair labor practice charge with SERB on September 16, 2021. Blaine alleged the Association had violated R.C. 4117.11(B)(6) by failing to fairly represent him as a bargaining unit employee.

{¶ 40} 12. Blaine's unfair labor practice charge was investigated by a SERB labor relations specialist.

{¶ 41} 13. In response to a request from the labor relations specialist for information, the Association filed a position statement and evidentiary materials on October 1, 2021. On October 7, 2021, Blaine filed his position statement and evidentiary materials in response to the labor relations specialist's request for information.

{¶ 42} 14. Among the materials submitted by Blaine was a written communication dated January 21, 2021, which was allegedly composed by Leffler. In the communication, Leffler allegedly stated that based on communications with the City's labor counsel, the City was willing to place the three other officers at a higher step in pay scale under 2018 CBA, but was opposed to doing so for Blaine. Leffler allegedly stated that "we are picking the arbitrator for Blaine and [the City's labor counsel] is checking about settling the matter for the other 3," noting that "[t]he City may want to wait to settle the 3 until we get a decision

back on Blaine, but if we can come up with an MOU about how these will be handled moving forward, they may be OK settling those now." (Stip. at 126.)

**{¶ 43}** 15. In a memorandum dated November 2, 2021, the labor relations specialist provided findings from the investigation and made a recommendation on the unfair labor practice charge to SERB. Based on the investigation of Blaine's unfair labor practice charge, the labor relations specialist recommended that SERB dismiss the charges with prejudice for lack of probable cause to believe that unfair labor practices had been committed by the Association.

**{¶ 44}** 16. On December 9, 2021, SERB dismissed the unfair labor practice charge with prejudice. In support of its decision to dismiss the charge, SERB made the following findings:

> Information gathered during the investigation revealed that Mr. Blaine has failed to provide sufficient information or documentation to show how the [Association's] actions were arbitrary, discriminatory or in bad faith when it voted not to advance his grievance to arbitration. The [Association's] President advised Mr. Blaine that, based on the advice of Counsel and a vote by the Executive Board, it would not be advancing his grievance to arbitration because it was untimely filed and lacked merit. The [Association] provided Mr. Blaine an opportunity to appeal the decision not to arbitrate, which he accepted, but the membership voted not to advance the grievance to arbitration, and the grievance was subsequently withdrawn. Based on the totality of the circumstances, the [Association's] actions do not rise to the level of a (B)(6) violation of the statute.

(Stip. at 143.)

**{¶ 45}** 17. Blaine filed a motion for reconsideration on January 6, 2022.

**{¶ 46}** 18. The Association responded to Blaine's motion for reconsideration on January 11, 2022.

{¶ 47} 19. In a memorandum dated January 13, 2022, the labor relations specialist provided findings regarding Blaine's motion for reconsideration and made a recommendation to SERB.

{¶ 48} 20. On January 25, 2022, Blaine filed a reply in support of his motion for reconsideration, which was supported by Blaine's affidavit. In his affidavit, Blaine stated that when he was rehired by the City in May 2018, he "brought to the attention of the City and [the Association] through its president * * * that the wage I was being paid by the City was contrary and in violation of the [CBA] between the City and the [Association] because the wage did not account for my years of service worked for [YPD] before I was rehired in May 2018." (Stip. at 177.) According to Blaine, the Association's president "informed me that I could not grieve [this] issue until the year probationary period expired because the terms of the CBA would not apply to me until that time." (Stip. at 177.) Blaine described the process for filing his grievance as follows:

> Prior to the expiration of the one year probationary period and immediately after this time in May and the beginning of June 2019 I requested that the [Association] file my grievance based on the improper wage I was being paid. I requested that this grievance be filed by speaking to the [Association] President * * * on several occasions, the [Association] would then prepare a grievance with an attorney from the [OPBA] as the designated representative for the grievance.
>
> * * *
>
> The [Association] chose not to file my grievance until June 18, 2019, and no one from the [Association] ever maintained that it was untimely until June 2021 when it determined not to proceed with the grievance through arbitration in 2021 * * * .

(Stip. at 177.)

{¶ 49} 21. On January 31, 2022, Blaine submitted a filing that, according to Blaine, contained new and additional evidence in support of reconsideration. Attached to the filing was a document purportedly reflecting a new collective bargaining agreement between the

Association and the City, which was to be effective from December 1, 2021 through November 30, 2024 ("2021 CBA"). Blaine stated in the filing that the 2021 CBA was sent to the Association's members on January 28, 2022.

{¶ 50} 22. On February 22, 2022, SERB denied Blaine's motion for reconsideration with prejudice, stating that "after reconsidering the information and argument provided by [Blaine] in [his] Motion for Reconsideration, the information and argument are not sufficient to warrant a change of the Board's previous decision." (Stip. at 268.)

{¶ 51} 23. On November 18, 2022, Blaine filed a complaint in mandamus in the Seventh District Court of Appeals. On December 13, 2022, Blaine filed an amended complaint in that court.

{¶ 52} 24. On December 29, 2022, Blaine, SERB, and the Association filed a joint motion to transfer venue to this court. On January 5, 2023, the Seventh District Court of Appeals issued a judgment entry granting the motion to transfer venue to this court.

{¶ 53} 25. On January 24, 2023, the judgment entry of the Seventh District Court of Appeals, Blaine's complaint, and Blaine's amended complaint were filed with this court.

## II. Discussion and Conclusions of Law

{¶ 54} Blaine seeks a writ of mandamus ordering SERB to reverse its probable cause determination and to grant Blaine a full hearing on the issue of whether the Association committed an unfair labor practice.

## A. Mandamus

{¶ 55} A writ of mandamus is an extraordinary remedy " 'issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specifically enjoins as a duty.' " *State ex rel. Russell v. Klatt*, 159 Ohio St.3d 357, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. *See State ex rel. Blachere v.*

*Tyack*, 10th Dist. No. 22AP-478, 2023-Ohio-781, ¶ 13 (stating that the purpose of mandamus is to compel the performance of an act that the law specifically enjoins as a duty resulting from an office, trust, or station). In order for a writ of mandamus to issue in this matter, Blaine must establish by clear and convincing evidence (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of SERB to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Gil-Llamas v. Hardin*, 164 Ohio St.3d 364, 2021-Ohio-1508, ¶ 19. " 'Clear and convincing evidence' is a measure or degree of proof that is more than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard required in a criminal case; clear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *State ex rel. Ware v. Crawford*, 167 Ohio St.3d 453, 2022-Ohio-295, ¶ 14, citing *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14.

## B. Unfair Labor Practices under the Ohio Public Employees Collective Bargaining Act

{¶ 56} Before the Public Employees Collective Bargaining Act ("the Act") was enacted, "Ohio had no legal framework governing public-sector labor relations, and dealt with these issues on an ad hoc basis." *State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.*, 22 Ohio St.3d 1, 5 (1986). Without this legal framework, public employees had no constitutional or statutory right to collectively bargain or strike. *Franklin Cty. Law Enforcement Assn. v. Fraternal Order of Police, Capital City Lodge No. 9*, 59 Ohio St.3d 167, 169 (1991). Upon its enactment in 1984, the Act, which is codified in R.C. Chapter 4117, "established a comprehensive framework for the resolution of public-sector labor disputes by creating a series of new rights and setting forth specific procedures

and remedies for the vindication of those rights." *Id.* The purpose of the Act is to "minimize public-sector labor conflict and to provide a mechanism for resolving disputes when they arise." *Dayton Fraternal Order of Police* at 6. In furtherance of this purpose, SERB was created as an agency of the state of Ohio with the charge of administering the Act. *State ex rel. Brecksville Edn. Assn. v. State Emp. Relations Bd.*, 74 Ohio St.3d 665, 666 (1996); R.C. 4117.02. The Act recognizes that public employers and employees, including employee organizations, have a right to be free from unfair labor practices, as such practices are defined in R.C. 4117.11. *Franklin Cty. Law Enforcement Assn.* at 169.

{¶ 57} SERB possesses "exclusive jurisdiction to determine the validity, or lack thereof, of unfair labor practices." *City of E. Cleveland v. E. Cleveland Firefighters Local 500, I.A.F.F.*, 70 Ohio St.3d 125, 127 (1994). *See* R.C. 4117.12(A); *Franklin Cty. Law Enforcement Assn.* at 170 ("SERB has exclusive jurisdiction to decide matters committed to it pursuant to R.C. Chapter 4117."); *State ex rel. City of Cleveland v. Sutula*, 127 Ohio St.3d 131, 2010-Ohio-5039, ¶ 20. R.C. 4117.12(B) governs the process employed by SERB to determine the validity of unfair labor practice charges, providing as follows: "When anyone files a charge with [SERB] alleging that an unfair labor practice has been committed, [SERB] or its designated agent shall investigate the charge. If [SERB] has probable cause for believing that a violation has occurred, [SERB] shall issue a complaint and shall conduct a hearing concerning the charge."

{¶ 58} Because probable cause is not defined in R.C. Chapter 4117, it must be accorded its ordinary meaning. *State ex rel. Portage Lakes Edn. Assn. v. State Emp. Relations Bd.*, 95 Ohio St.3d 533, 2002-Ohio-2839, ¶ 37. Considering the ordinary meaning, the Supreme Court of Ohio has held that "SERB must issue a complaint and conduct a hearing on an unfair labor practice charge if, following an investigation, it has a

reasonable ground to believe that an unfair labor practice has occurred." *Id.* at ¶ 38. *See State ex rel. Teamsters Local Union No. 284 v. State Emp. Relations Bd.*, 10th Dist. No. 20AP-307, 2021-Ohio-3318, ¶ 14. "In making its determination, SERB will consider not only the evidence that supports the allegations of the charge but also, of course, any information that may rebut the charge or offer a defense to the violation alleged. Issues such as managerial justification, the absence of protected activity by a charging party, or the failure to show any indication of unlawful motivation may be sufficient to secure dismissal of a case even when the facts alleged in the charge have been verified." (Citation and quotation omitted.) *Portage Lakes* at ¶ 40. In this way, the court likened SERB's probable cause determination to that of a prosecutor investigating a citizen's complaint of criminal activity. *Id.* at ¶ 39-40. The charging party bears the initial burden of demonstrating that an unfair labor practice has occurred. *State ex rel. Fuller v. State Emp. Relations Bd.*, 193 Ohio App.3d 272, 2011-Ohio-1599, ¶ 28 (10th Dist.).

**{¶ 59}** Mandamus is the appropriate action to challenge SERB's dismissal of an unfair labor practice charge for lack of probable cause. *State ex rel. Serv. Emp. Internatl. Union, Dist. 925 v. State Emp. Relations Bd.*, 81 Ohio St.3d 173 (1998), paragraph one of the syllabus. *See Ohio Assn. of Pub. School Emp., Chapter 643, AFSCME/AFL-CIO v. Dayton City School Dist. Bd. of Edn.*, 59 Ohio St.3d 159, 161 (1991) (stating that "a decision by SERB whether or not to issue a complaint in an unfair labor practice case is not reviewable pursuant to R.C. Chapter 119 or R.C. 4117.02(M) and 4117.13(D)"). "SERB is under a clear legal duty to issue a complaint concerning an unfair labor practice charge when SERB's investigation of that charge reveals the existence of probable cause to believe that an unfair labor practice has been committed." *Serv. Emp.*, 81 Ohio St.3d at 179.

{¶ 60} A court reviews SERB's determination to dismiss an unfair labor practice charge for an abuse of discretion. *State ex rel. Leigh v. State Emp. Relations Bd.*, 76 Ohio St.3d 143, 145 (1996); *State ex rel. Professionals Guild v. State Emp. Relations Bd.*, 10th Dist. No. 08AP-417, 2009-Ohio-2155, ¶ 12 (stating that in considering the evidence "the question before us is not whether we disagree with SERB's determination that probable cause did not exist, but whether SERB abused its discretion in so concluding"). "An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable." *State ex rel. Stiles v. School Emps. Retirement Sys.*, 102 Ohio St.3d 156, 2004-Ohio-2140, ¶ 13. *See also Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 39. Determination of whether there exists reasonable ground to believe an unfair labor practice has occurred is "generally factual, and courts cannot substitute their judgment for that of SERB if there is conflicting evidence." *State ex rel. Hall v. State Emp. Relations Bd.*, 122 Ohio St.3d 528, 2009-Ohio-3603, ¶ 19.

## C. Whether SERB Abused Its Discretion by Dismissing the Unfair Labor Practice Charge

{¶ 61} Blaine alleged in his unfair labor practice charge that the Association violated R.C. 4117.11(B)(6). In pertinent part, R.C. 4117.11(B) provides: "It is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to: * * * (6) Fail to fairly represent all public employees in a bargaining unit."

{¶ 62} When determining whether a union has violated its duty of fair representation under R.C. 4117.11(B)(6), SERB evaluates "if the union's actions are arbitrary, discriminatory, or in bad faith" and, if it "finds any of these components," SERB will find "the duty has been breached." *In re Ohio Council 8, AFSCME, AFL-CIO* ("*Ohio Council 8*"), SERB No. 2004-005, 2004 OH SERB LEXIS 29, at *13 (Aug. 9, 2004). In *Vencl*

*v. Internatl. Union of Operating Engineers, Local 18*, 137 F.3d 420 (6th Cir.1998), the

United States Court of Appeals for the Sixth Circuit addressed the meaning of the term

"arbitrary" in the context of a union's duty of fair representation under the National Labor

Relations Act ("NLRA"):

> The NLRA imposes a duty of fair representation upon unions. *Storey v. Local 327, Intl Brotherhood of Teamsters*, 759 F.2d 517, 518 (6th Cir. 1985). A union breaches that duty by acting arbitrarily. *Ruzicka v. General Motors Corp.*, 649 F.2d 1207, 1209 (6th Cir. 1981) ("*Ruzicka II*"). A union acts arbitrarily by failing to take a basic and required step. *Id.* at 1211. Timely filing is both basic and required. In *Ruzicka II*, the union failed to file a timely grievance. The court noted that "absent justification or excuse, a union's negligent failure to take a basic and required step, unrelated to the merits of the grievance, is a clear example of arbitrary and perfunctory conduct which amounts to unfair representation." *Id.* (citation omitted). As an example of a viable excuse, the court held that the union's untimely filing could be excused if a prior course of dealing reasonably indicated that the employer would accept a late filing.

*Vencl.* at 426. SERB has adopted the analysis in *Vencl* in determining whether a union

has violated its duty of fair representation under R.C. 4117.11(B)(6),[1] explaining its

analysis of arbitrariness as follows:

> There are certain basic and required steps a union must take when fulfilling its duty of fair representation; the specific steps will vary depending upon the nature of the representation being provided; a non-exhaustive list of these representation functions includes filing a grievance, processing a grievance, deciding whether to take a grievance to arbitration, participating in labor-management committee meetings, negotiating with an employer regarding wages,

---

[1] The Supreme Court of Ohio and this court have looked to interpretations of the NLRA in interpreting R.C. Chapter 4117. *See Greater Dayton Regional Transit Auth. v. State Emp. Relations Bd.*, 10th Dist. No. 14AP-876, 2015-Ohio-2049, ¶ 23; *State Emp. Relations Bd. v. Adena Local School Dist. Bd. of Edn.*, 66 Ohio St.3d 485, 495 (1993) (stating that R.C. Chapter 4117's treatment of unfair labor practice cases "is modeled to a large extent on the federal statutes" that empower the National Labor Relations Board to resolve unfair labor practice charges); *State ex rel. Glass, Molders, Pottery, Plastics & Allied Workers Internatl. Union v. State Emp. Relations Bd.*, 70 Ohio St.3d 252, 254 (1994) (stating that "in respect to bargaining-unit determination, Ohio's public employee collective bargaining law is analogous to the National Labor Relations Act"); *State Emp. Relations Bd. v. Miami Univ.*, 71 Ohio St.3d 351, 353 (1994) (stating that considering the "relationship that federal decisions bear to Ohio public-sector labor law" was "important" though not "conclusive" in interpreting R.C. Chapter 4117).

> hours, terms and conditions of employment, and conducting a contract ratification meeting. Failure to take a basic and required step while performing any of these representation functions creates a rebuttable presumption of arbitrariness. When looking at this issue, we must look at all of the circumstances involved, including, but not limited to, what steps were basic and required, how severe the mistake or misjudgment was, what the consequences of the union's acts were, and what the union's reasons for its acts were.
>
> The initial burden is on the Charging Party and the Complainant to show that the union acted arbitrarily, and therefore did not fairly represent the Charging Party, by showing that the union failed to take a basic and required step. Once that burden has been met, the union must come forth with its justification or viable excuse for its actions or inactions.

*In re Ohio Civil Service Emps. Assn., AFSCME Local 11, Chapter 2525* ("*OCSEA*"), SERB No. 98-010, 1998 OH SERB LEXIS 15, at *8-9 (July 22, 1998). *See In re Clark-Shawnee Local Edn. Assn.*, SERB No. 2011-007, 2011 OH SERB LEXIS 28, at *11 (Nov. 17, 2011); *In re Ohio Council 8*, SERB. No. 2004-005, 2004 OH SERB LEXIS 29, at *13-14. The Supreme Court of Ohio has favorably noted SERB's use of the test in *Vencl* in determining whether SERB abused its discretion by dismissing an unfair labor practice charge. *Hall*, 2009-Ohio-3603, at ¶ 23-28.

{¶ 63} To begin, SERB asserts its interpretation of the Act is entitled to deference because SERB was charged with its administration and enforcement. The Supreme Court of Ohio has "rejected the notion that a court must defer to an agency's interpretation of a statute that it is tasked with implementing." *In re Alamo Solar I, L.L.C.*, 174 Ohio St.3d 143, 2023-Ohio-3778, ¶ 12. *See TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 172 Ohio St.3d 225, 2022-Ohio-4677, ¶ 3 (stating that "the judicial branch is *never* required to defer to an agency's interpretation of the law" (Emphasis in original)). The court has also found that it is improper to defer to an administrative agency's interpretation of its own regulations. *Alamo Solar* at ¶ 14 (stating that deferring to an agency's interpretation of its own regulations "violates the fundamental

precept that the power of lawmaking and law exposition should not be concentrated in the same hands," and therefore concluding that a court must "independently interpret the regulations at issue"). In this matter, no party has challenged the standard applied by SERB in examining an unfair labor practice charge under R.C. 4117.11(B)(6). Because of this and considering the Supreme Court of Ohio favorably recognized SERB's use of this standard in *Hall*, it is unnecessary at this time to further examine SERB's interpretation of an unfair labor practice charge under R.C. 4117.11(B)(6). *See State ex rel. Cassens Corp. v. Indus. Comm. of Ohio*, 174 Ohio St.3d 414, 2024-Ohio-526, ¶ 19, fn. 6 (finding, in the context of a workers' compensation matter, it was unnecessary to decide the extent to which a court should defer to an administrative agency's interpretation of a specific safety rule because "the case can be resolved on other grounds").

{¶ 64} Turning to the merits, SERB argues that regardless of "[w]hether the wages paid to Blaine were appropriate or not, under the arbitration provision in the [2018 CBA] between the City and the [Association], [Blaine] did not have a right to demand arbitration on the issue." (SERB's Brief at 1.) It is undisputed that under Article 12, Section 4 of the 2018 CBA, an appeal of a grievance to arbitration was "conditioned on the signed approval of the [Association] President or OPBA Attorney." (Stip. at 56.) Thus, SERB is correct that grievants, such as Blaine, had no right under the 2018 CBA to require the Association bring their grievances to arbitration. Yet, while SERB is correct on this point, it is not determinative of the issue raised in Blaine's unfair labor practice charge. Rather, the issue before SERB was whether the Association failed to fairly represent Blaine, i.e., acted in an arbitrary, discriminatory, or bad faith manner, by deciding not to bring Blaine's grievance to arbitration—or, more accurately, by withdrawing its initial submission of Blaine's grievance to arbitration.

{¶ 65} SERB explained its decision to dismiss Blaine's unfair labor practice charge by citing the letter from the Association's president to Blaine. SERB stated that the Association's president "advised Mr. Blaine that, based on the advice of Counsel and a vote by the Executive Board, it would not be advancing his grievance to arbitration because it was untimely filed and lacked merit." (Stip. at 143.) SERB also stated that the Association provided Blaine an opportunity to appeal the decision not to arbitrate, noting that the Association's membership voted not to advance the grievance to arbitration. Arguing SERB provided no explanation for its probable cause determination other than restating the Association's reasons in the letter from the Association's president, Blaine disputes both of the reasons provided by the Association in support of its decision not to advance his grievance to arbitration.

{¶ 66} First, with regard to the timeliness of the grievance, Blaine argues that the Association's actions prevented his grievance from being filed any earlier. In his letter to the labor relations specialist, Blaine, through counsel, stated that the Association and OPBA were aware of Blaine's complaints regarding his rate of pay when Blaine was rehired in May 2018, but the Association decided not to process Blaine's grievance until after Blaine's probationary period expired in June 2019. In Blaine's affidavit, he stated that when he was hired in May 2018, he informed the City and the Association of his belief that his wage was not in accordance with the terms of the 2018 CBA. According to Blaine, the Association's president told Blaine that he could not submit a grievance until after his one-year probationary period expired. In June 2019, after Blaine renewed his request for a grievance, the Association, through Leffler, filed a grievance. Blaine stated in his affidavit that the "[Association] chose not to file my grievance until June 18, 2019, and no one from the

[Association] ever maintained that it was untimely until June 2021 when it determined not to proceed with the grievance through arbitration." (Stip. at 177.)

{¶ 67} As reflected in the letter from the Association's president to Blaine, OPBA's attorney was aware of Blaine's contention that the Association advised him not to file a grievance during the probationary period. Specifically, Leffler stated that "Blaine indicated that he was advised by someone within the [Association] to not file a grievance during his probationary period." (Stip. at 37, 129.) Notably, Leffler did not deny this allegation or provide any evidence to the contrary, but instead stated that "[w]hether that was the case does not change the evidence before the arbitrator that he was untimely in filing the grievance, to a supervisor within 7 days of knowledge of the alleged violation or within 18 days with the Chief of Police." (Stip. at 37, 129.) However, these statements by Leffler appear to differ from those he made when submitting the grievance. In the grievance form, Leffler stated that Blaine's improper pay rate was a "continuing violation" of the 2018 CBA. (Stip. at 35, 118.) Blaine argues that the statement regarding the "continuing violation" of the 2018 CBA is relevant because "each time Mr. Blaine was paid a violation of his rights under the CBA occurred – so [] his grievance on this issue could *not* have been untimely." (Emphasis in original.) (Blaine's Brief at 25.)

{¶ 68} Courts, including this court, have addressed the impact of an untimely filing when considering claims that a union violated its duty of fair representation. In *Vencl*, the United States Court of Appeals for the Sixth Circuit made clear that "[a] union acts arbitrarily by failing to take a basic and required step" and "[t]imely filing is both basic and required." *Vencl*, 137 F.3d at 426. This court has previously considered whether SERB abused its discretion by dismissing an unfair labor practice charge against a union for failing to take a required step in *Fuller*, 2011-Ohio-1599, at ¶ 32. In *Fuller*, a public

employee was fired after being arrested at work. The employee's union filed a grievance contesting the termination under the terms of the CBA. The public employer and the union agreed to stay the grievance process until the conclusion of the criminal proceedings against the employee. The employee was ultimately acquitted of the charges. There were differing accounts as to when the employee notified the union of his acquittal, but the union did not inform the employer of its intent to process the grievance to arbitration until several months after the acquittal.

{¶ 69} Finding that the union had failed to timely notify the employer of its intent to arbitrate, the arbitrator dismissed the grievance. The employee filed an unfair labor practice against the union, arguing that the union had breached its duty to fairly represent him under R.C. 4117.11(B)(6). SERB dismissed the unfair labor practice charge on the basis that the employee failed to timely notify the union of his acquittal resulted in the union's untimely notice of intent to arbitrate to the employer. The Franklin County Court of Common Pleas found that SERB abused its discretion because the evidence did not support finding the employee refused to cooperate with the union or did anything to hinder the union's discovery of his acquittal.

{¶ 70} On appeal, this court considered whether the employee failed to cooperate with the union regarding his acquittal or hindered the union's ability to learn the date of acquittal for purposes of calculating the deadline for written notice of intent to arbitrate. Affirming the common pleas court, this court found that because there was no evidence the employee refused to cooperate with the union, SERB "lacked any basis" for finding the employee bore the responsibility for the union's failure to take a basic and required step." *Fuller* at ¶ 34. "In other words," this court found that "the evidence presented does not establish that [the employee's] delay in informing [the union] of his acquittal justified [the

union's] failure to timely provide [the employer] notice of its intent to arbitrate." *Id.* Because there existed no justification for the union's failure to take a basic and required step, "the presumption that [the union] acted arbitrarily remains in place." *Id.*

**{¶ 71}** Though *Fuller* presents a somewhat different factual scenario from the instant matter, its analysis is instructive. By citing the Association's reasons, including the untimeliness of the grievance, in dismissing the unfair labor practice charge, SERB appears to have agreed with the Association's determination that the grievance was untimely, thereby supporting its decision to withdraw the grievance from arbitration. However, the undisputed evidence in the record reflects that when Blaine was rehired in 2018, he notified the Association that he wished to bring a grievance regarding his pay based on the City's interpretation of the 2018 CBA. The Association did not bring a grievance until June 2019. The Association then relied on the alleged untimeliness of Blaine's grievance as a reason for ultimately deciding not to pursue arbitration. SERB did not address the Association's responsibility for timely filing the grievance or whether the Association was responsible for causing the grievance to be untimely in its decision dismissing the unfair labor practice charge or in its decision denying Blaine's request for reconsideration.

**{¶ 72}** Again, it is true that the Association was not required by the 2018 CBA to bring Blaine's grievance to arbitration. But the Association's decision to not bring the grievance to arbitration must have a legitimate, rational basis. *See Marquez v. Screen Actors Guild*, 525 U.S. 33, 45-46 (1998) (finding that "[a] union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation"); *In re AFSCME, Local 2312* ("*Local 2312*"), SERB No. 89-029, 1989 OH SERB LEXIS 29, at *20-21 (Oct. 16, 1989) (stating that a union's action is not arbitrary if there is a rational basis for the union's position). Without more explanation, it is unclear how SERB resolved

the factual questions in the record to find that the Association's stated reason that the grievance was untimely was a legitimate, rational basis to withdraw the request for arbitration. On this basis alone, a limited writ ordering SERB to provide reasons in support of its decision is appropriate. *See State ex rel. Staple v. State Emp. Relations Bd.*, 10th Dist. No. 22AP-78, 2024-Ohio-140, ¶ 43; *State ex rel. Ohio Assn. of Pub. School Emps./AFSCME v. State Emp. Relations Bd.*, 64 Ohio St.3d 149, 153 (1992) (issuing a limited writ directing SERB to consider all the facts and circumstances of the case relevant to the question of timeliness, and to issue some explanation setting forth its reasoning).

{¶ 73} Second, with regard to the merit of the grievance, Blaine argues that the Association took conflicting positions, both before and after notifying the City that it intended to arbitrate the grievance. Blaine points to several pieces of evidence in support of this point including the October 7, 2019 email from OPBA's counsel advancing the grievance to arbitration, the January 21, 2021 communication allegedly from Leffler to the Association's president, the terms of the 2018 CBA, a letter of understanding in the 2021 CBA, and Blaine's own affidavit.

{¶ 74} In the January 21, 2021 communication, counsel for OPBA allegedly stated that "from March through roughly the end of July, all the hearings, fact-findings and arbitrations were on hold due to Covid." (Stip. at 126.) In addressing Blaine's grievance and the grievance of three other officers who had raised similar pay issues, counsel for OPBA allegedly stated the following:

> With regard to the pending grievances for the pay rates for Richard Blaine and 3 other recently hired officers, here is the latest. When I last talked to Mike Esposito, the City's labor counsel, in October the City was willing to place the 3 officers at the higher step in the scale, but was opposed to advancing Blaine. The City asserts that Blaine took a buyout and signed an agreement not to return, thereby waiving his right to come

> back at a higher rate. We proposed settling the matter for the 3 officers and arbitrating the Blaine grievance. Esposito was checking with the City on that proposal. Unfortunately, Covid sidelined us again as there were positive tests on both sides. In my most recent discussion with Esposito, we are picking the arbitrator for Blaine and he is checking about settling the matter for the other 3. The City may want to wait to settle the 3 until we get a decision back on Blaine, but if we can come up with an MOU about how these will be handled moving forward, they may be OK settling those now.

(Stip. at 126.) In his position statement to SERB, Blaine, through counsel, argued that the January 21, 2021 communication from OPBA's counsel "demonstrates the delay in [Blaine's] arbitration due to COVID-19 concerns and restrictions" as well as the "change of the bargaining units in the course of his representation once an agreement through a Memorandum of Understanding was reached for the other three officers." (Stip. at 42.) In his affidavit, Blaine states that "three other officers raised the identical pay issue after being rehired by the City" and the Association "settled or discussed settlement with the City of this issue between the other three officers." (Stip. at 178.)

{¶ 75} Blaine also points to the CBA in disputing the Association's position that his grievance lacked merit. Throughout the CBA, seniority was referred to by use of the term "bargaining unit seniority," which was defined as "accumulated, continuous full-time service as a Patrol Officer with the City." (Stip. at 64.) Thus, seniority for bargaining unit members was not merely based on full-time service, but **continuous** full-time service. Among other conditions, a voluntary resignation served to break a period of continuous service. However, with regard to salary and wages, the CBA did not use either "bargaining unit seniority" or "continuous full-time service." Rather, the pay classification system was based on "Years of Full-Time Service." (Stip. at 93.) The word "continuous" does not appear. Usage of the phrase "full-time service" was repeated elsewhere in the CBA in the context of compensation including with regard to a one-time lump sum payment to bargaining unit employees in varying amounts based on "Years of Full-Time Service." (Stip. at 70.)

{¶ 76} Blaine argues that the 2021 CBA,[2] which was submitted to SERB by Blaine in support of reconsideration, shows that "there was no language in the CBA that pertained to Mr. Blaine when he was rehired by the City that deprived him a wage that included his prior years of service." (Blaine's Brief at 20.) The letter of understanding provides that the Department and the Association "have identified a need to clarify the procedures and administration of the [CBA] with respect to employees who have voluntarily resigned employment (not retired) in good standing." (Stip. at 236.) With regard to pay, the letter provides:

> Employees who have voluntarily resigned employment in good standing who subsequently retest and are reappointed as a police officer with [YPD] will receive credit for their prior service time on the wage schedule under the [CBA] in effect at the time of reappointment, provided that the reappointment is made within two (2) years of the resignation.
>
> An employee who returns to service as a police officer outside of the circumstances described above will not be credited with service time on the parties' wage schedule.

(Stip. at 236.)

{¶ 77} Blaine argues that this evidence demonstrates the Association changed its position on the merit of his grievance without any explanation for the change. Nothing in the Association's communications throughout the grievance process until the June 1, 2021 letter from the Association's president to Blaine indicated that the Association believed the grievance was without merit. Indeed, even after the time the Association notified the Department of its intent to arbitrate the grievance, the Association continued to demonstrate an intent to take Blaine's grievance through the arbitration process, as

---

[2] SERB acknowledges the 2021 CBA was before SERB when it rendered its decision on Blaine's motion for reconsideration. SERB states that "Blaine also introduced a portion of a new Collective Bargaining Agreement between the [Association] and the City, which expressly provided that employees who resign and return to employment more than two years later will not be credited with their prior years of service for their wage rate." (SERB's Brief at 6.)

reflected in January 2021 communication from Leffler. At the same time, the evidence reflects the Association was pursuing and ultimately reached a settlement for three other bargaining unit members who were seeking to be placed at a higher step on the pay scale based on years of full-time service accumulated prior to being rehired by the City.

{¶ 78} Based on the difference in treatment afforded other bargaining unit members with a similar issue, the change in the Association's position on merit of his grievance, the language in the 2018 CBA pertaining to wage on the basis of years of full-time service, and the addition of language in the 2021 CBA addressing the issue raised by Blaine and three other bargaining unit members, Blaine contends that the Association's change of position on arbitrating Blaine's grievance violated its duty of fair representation under R.C. 4117.11(B)(6). SERB acknowledges Blaine's argument that the Association's "expressed basis for forgoing arbitration was pretextual, and that the decision was made, not because the grievance lacked merit, but because the [Association] wanted to further its contractual negotiations with the City." (SERB's Brief at 18.) Citing *Local 2312*, SERB argues that even assuming that this allegation is true, it does not support Blaine's position because a union is permitted to consider contract administration issues when deciding how to proceed with a grievance.

{¶ 79} First, Blaine does not argue that the Association offered a pretextual reason for its decision on the merits of the grievance merely because it wanted to further its contractual negotiations with the City. Blaine also argues that the Association treated him "differently and unfairly compared to three other officers who raised the same pay issue." (Blaine's Brief at 21.) Blaine argues that the Association's change in position on the merit of the grievance and its different treatment of other members with a similar grievance

demonstrate an improper motive showing "bad faith or that the [Association] acted in an arbitrary manner." (Blaine's Brief at 15.)

{¶ 80} Second, while *Local 2312* does recognize that unions have the discretion to "weed out frivolous grievances, seek resolutions through other effective means, achieve settlements that enhance consistency, or maintain the integrity of the collective bargaining agreement," it does not conclude that a union may advance a pretextual basis for deciding not to process a grievance to arbitration. *Local 2312* at *27. In that case, the union pursued an employee's grievance through the grievance process, but agreed to a settlement of the grievance with the employer instead of bringing the grievance to arbitration. The employee was dissatisfied with the settlement and requested that the union pursue another grievance. When the union did not, the employee brought an unfair labor practice charge, alleging a violation of R.C. 4117.11(B)(1) and (6). Though SERB found probable cause to believe an unfair labor practice had been committed, it ultimately concluded the union did not breach its duty of fair representation. SERB deferred to the union's decision to accept a settlement that provided adequate compensation, even though not as much as sought by the employee. SERB found that R.C. 4117.11(B)(6) "does not guarantee an employee an absolute right to have a grievance taken to arbitration, nor does it prohibit settlement contrary to the precise demands of the employee." *Id.* at 26-27.

{¶ 81} Unlike in *Local 2312*, here, Blaine alleged that the Association pursued a settlement on behalf of some of its members with a similar issue while declining to advance Blaine's grievance to arbitration. Nor did the Association include Blaine in any settlement achieved with the Department on behalf of the other employees with a similar issue. Also, unlike in *Local 2312*, Blaine asserted that the Association's reasons for not pursuing his grievance to arbitration were pretextual. For these reasons, *Local 2312* does not support

SERB's position that the Association was able to use pretextual reasons to support its decision to withdraw the grievance from the arbitration process.

{¶ 82} A union need not process a grievance, let alone advance a grievance to arbitration, that it finds to be lacking in merit, provided that determination of the merits is made in good faith. *See Williams v. Molpus*, 171 F.3d 360, 366-67 (6th Cir.1999); *Ruzicka v. Gen. Motors Corp.*, 649 F.2d 1207, 1212 (6th Cir.1981) (stating that "when a bargaining representative acts arbitrarily in failing to process a grievance submitted to it by an employee without a sound reason for its decision, * * * the union [will be] liable for unfair representation"). And a change of position, in and of itself, may not necessarily reflect a breach of the duty of good faith representation. *See Bettencourt v. United Airlines Inc.*, S.D.Tex. No. 4:19-CV-2981, 2021 U.S. Dist. LEXIS 78649, at *14 (Apr. 23, 2021) (stating that a "Union's eventual change of position on the merits of the grievance does not, in itself, establish a breach of duty"); *Bingham v. Boeing Co.*, C.D.Cal. No. CV 01-01449 CBM (JWJx), 2002 U.S. Dist. LEXIS 13886, at *17 (Apr. 10, 2002) ("A change of position, based on inquiry and research, is evidence of reasoned decisionmaking, not arbitrariness."); *Olson v. Bemis Co.*, E.D.Wis. No. 12-C-1126, 2014 U.S. Dist. LEXIS 53372, at *32-33 (Apr. 17, 2014). Yet, here, SERB's decision does not mention the Association's change in position on the merits of the grievance or the Association's pursuit of a settlement on behalf of three other bargaining unit members with a similar issue. This court cannot substitute its judgment for that of SERB when resolving conflicts in the evidence, but there is no indication that SERB exercised its judgment or even recognized any of the inconsistencies pointed out by Blaine when it cited the Association's reason that the grievance lacked merit. In the absence of any explanation or reasoning from SERB regarding any of these issues in either the decision dismissing the unfair labor practice charge or the decision denying

Blaine's request for reconsideration, it is difficult, if not impossible, to discern whether SERB abused its discretion. *See generally State ex rel. Shipley v. Ludowici-Celadon*, 10th Dist. No. 05AP-1172, 2006-Ohio-6893, ¶ 4 (stating in the context of a workers' compensation case that "where the evidence cited by the commission suggests a different result than the conclusion announced by the commission, the commission's reasoning is critical"); *State ex rel. Prinkey v. Emerine's Towing, Inc.*, 10th Dist. No. 22AP-264, 2024-Ohio-1137, ¶ 76. Therefore, in light of and consistent with the recommendation to grant a limited writ ordering SERB to explain its reasoning related to the timeliness of the grievance, the magistrate recommends that this court also order SERB to provide an explanation of its reasoning with regard to the merits of Blaine's grievance. *See Staple*, 2024-Ohio-140, at ¶ 43; *Ohio Assn. of Pub. School Emps.*, 64 Ohio St.3d at 153.

## D. Conclusion

{¶ 83} Accordingly, it is the decision and recommendation of the magistrate that this court should grant a limited writ of mandamus ordering SERB to vacate its order dismissing Blaine's unfair labor practice charge, consider all facts and circumstances relevant to the alleged violation of R.C. 4117.11(B)(6), and issue a new order that sufficiently explains SERB's reasoning for its decision on that charge.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

### NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects

to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.